**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| SAMIH OMAR, | ) | CASE NO. 1:06 cv 2750 |
| Plaintiff, | ) ) | |
| | ) | JUDGE OLIVER |
| v. | ) ) | |
| MICHAEL CHERTOFF, Secretary Department of Homeland Security, et al., | ) ) ) | MAGISTRATE JUDGE VECCHIARELLI |
| Defendants. | ) | **REPORT AND RECOMMENDATION** |

On November 19, 2007, Defendants Michael Chertoff, Emilio T. Gonzales, and Mark B. Hansen ("Defendants") filed a motion for summary judgment. (Doc. No. 28.) Plaintiff, Samih Omar, filed a brief in opposition on August 21, 2008. (Doc. No. 44.) In addition, on December 19, 2007, Omar filed a motion for a *de novo* hearing. (Doc No. 38.) Defendants filed a brief in opposition. (Doc. No. 40.) On March 1, 2010, both motions were referred to the Undersigned for Report and Recommendation. (Doc. No. 47.) For the reasons set forth below, the Magistrate Judge recommends that Omar's motion for a *de novo* hearing (Doc. No. 38) be DENIED and Defendants' motion summary judgment (Doc. No. 28) be GRANTED.

1

## I. BACKGROUND

Plaintiff, Samih Omar, a native and citizen of Jordan, entered the United States on September 5, 1991, as a non-immigrant to pursue asylum. (Doc. No. 28, Ex. A.) On January 28, 1993, Omar divorced his wife who was living in Jordan with their three children. (Doc. No. 28, Ex. B at 16-18 and Ex. C at Suppl. 1.) On November 25, 1993, Omar married an American citizen, a 19-year-old named Anjanette Flanagan. (Doc. No. 28, Ex. C, Part 5.) Omar was 34 years old at that time. (Doc. No. 28, Ex. C, Part 1.)

On March 24, 1994, Flanagan filed a visa petition on behalf of Omar. (Doc. No. 28, Ex. D.) Omar filed an application for permanent residency at that time. (Doc. No. 28, Ex. E.) On July 1, 1994, the INS denied Omar's previously filed request for asylum. (Doc. No. 28, Ex. F.) On July 8, 1994, deportation proceedings began against Omar. (Doc. No. 28, Ex. A.) On October 7, 1994, Omar was ordered deported, allowing him voluntary departure by January 7, 1995. (Doc. No. 28, Ex. G.)

On October 28, 1994, the INS granted Omar's visa petition. (Ex. D.) On January 6, 1995, an immigration judge granted Omar's earlier filed motion to reopen deportation proceedings. (Doc. No. 28., Ex. H.) On October 25, 1995, the INS approved Omar's Application to Register Permanent Residence or Adjust Status. (Doc. No. 28, Ex. E and Ex. I)

On September 21, 1998, Omar filed his first Form N-400, Application for Naturalization, with the INS, on the basis that he had been a permanent resident alien for at least three years and had been married to a United States citizen for those three years. (Doc. No. 28, Ex. C, Parts 2, 3.) Omar and his United States citizen spouse, Flanagan, were interviewed under oath on this application on July 5, 2001, by a District

2

Adjudication officer. (Doc. No. 28, Ex. J at unnumbered p. 3.) The interviews were memorialized by videotape and transcribed. (Doc. No. 28, Ex. L and Ex. K.) During his interview, the District Adjudication officer asked Omar, "Who is occupying the bedrooms [of Omar's residence at 3635 West 140th Street] now?" Omar replied, "Me and my wife." (Doc. No. 28, Ex. L. at 3.)

On August 30, 2001, Omar filed a second Form N-400, Application for Naturalization, with the INS, on the basis that he had been a permanent resident for at least five years. (Doc. No. 28 , Ex. M.)[1] A District Adjudications Officer interviewed Omar regarding the second application on August 26, 2002. (Doc. No. 28, Ex. N, first page.) This interview was not videotaped.

On December 23, 2005, Omar filed a Petition for Hearing on Naturalization Application in this court, Case No. 1:05CV2964, requesting *de novo* review on the Application for Naturalization filed on August 30, 2001. On February 22, 2006, the USCIS[2] issued decisions denying both applications for naturalization. In the first decision, denying the application for naturalization filed on September 21, 1998, the USCIS determined that Omar failed to establish that he had lived in marital union with his United States citizen wife for the statutorily required three years prior to filing his application under 8 U.S.C. § 1430, INA § 319. (Doc. No. 28, Ex. J at unnumbered p. 4.)

---

[1]Omar attempted to withdraw his earlier application, but USCIS denied the request. (Doc. 28, Ex. 28 at 3-4.)

[2]On March 1, 2003, service and benefit functions of the INS transitioned into the Department of Homeland Security as the U.S. Citizenship and Immigration Services ("USCIS").

3

Additionally, the USCIS denied the September 21, 1998, application for naturalization because Omar failed to establish the good moral character required by 8 U.S.C. § 1427 in that he had given false testimony in order to obtain a benefit under the INA at the interview on July 5, 2001. (Ex. J at unnumbered pp. 5-6.) For this same reason, the USCIS denied the second application for naturalization filed on August 30, 2001. (Ex. N at unnumbered p. 3.)

On March 30, 2006, this court remanded Case No. 1:05CV2964, to the USCIS in order for Omar to pursue his administrative appeal rights to the denial of the two applications for naturalization. Omar filed an appeal of the denial of the two decisions with USCIS. On June 29, 2006, on appeal, a District Adjudications Officer interviewed Omar. The interview was memorialized by videotape and was transcribed for these proceedings. (Doc. No. 28, Ex. O.) During this interview, Omar admitted that he had not been living with Flanagan at the time of the July 5, 2001 interview and, in fact, for the two years prior to the July 5, 2001 interview, *i.e.*, since 1999. (Doc. No. 28, Ex. O at 13-14.)

In addition, Flanagan swore an affidavit in which she stated that she had not lived with Omar since 1995, other than a brief period of less than a month in 1996. (Doc. No. 28, Ex. P., Flanagan Aff. at 3.) Flanagan also stated that she had never lived at Omar's 3635 West 140th Street at all, but that Omar asked her to get identification bearing that address. (*Id.* at 8.)

On August 29, 2006, the USCIS issued decisions upholding the denial of the decisions on both applications for naturalization. (Doc. No. 28, Ex. P and Ex. Q.) The USCIS based on its conclusions that Omar failed to establish a marital union with his

4

U.S. citizen wife as required by Section 1430, and that Omar had failed to establish good moral character pursuant to Section 1427 due to false testimony he provided at the interview of July 5, 2001, in his effort to establish the marital union. (*Id*.)

On November 14, 2006, Omar filed the instant action that seeks (1) a court order directing USCIS to produce documentation relating to his naturalization applications, and (2) adjudication of his application for naturalization. (Doc. No. 1.)  The issues regarding document production were resolved by Court Order.  (*See* Doc. Nos. 24 and 52.)  The only issue before this court is whether Omar is eligible for naturalization.

On November 19, 2007, Defendants filed a motion for summary judgment seeking a determination that there is no genuine issue of material fact that Omar is not eligible for citizenship. (Doc. No. 28.)  Omar did not immediately file a reply to this motion.  Rather, he filed a Motion for a *De Novo* Hearing on December 19, 2007.  (Doc. No. 38.)  Defendants oppose this motion.  (Doc. No. 40.)  Eventually, on August 21, 2008, Omar filed a reply in opposition to the summary judgment motion.  (Doc. No. 44.)

Now before the court are the motion for summary judgment and the motion for a de novo hearing.  On March 1, 2010, both matters were referred to the Undersigned for Report and Recommendation.  (Doc. No. 47.)

## II.  *DE NOVO* REVIEW

Omar requests a hearing *de novo* pursuant to 8 U.S.C. § 1421(c).  Omar essentially asserts that he is entitled to bypass summary judgment under this statute and may proceed directly to bench trial.

Since 2002, "[t]he Bureau of U.S. Citizenship and Immigration Services . . . handles applications for U.S. citizenship." *Chan v. Gantner*, 464 F.3d 289, 290 (2d Cir.

5

2006) (internal citation omitted).  The naturalization application process has been described as follows.

> After five years of continuous residence following lawful admission to permanent residence, an alien becomes eligible to apply for naturalization. 8 U.S.C. § 1427(a).  A naturalization applicant must demonstrate, *inter alia*, good moral character; the ability to read, write and speak English; and a basic knowledge of United States history and government. *See* 8 U.S.C. § 1423(a), § 1427(a)(3).  The applicant also has the burden of proving he was "lawfully admitted to the United States for permanent residence." 8 U.S.C. § 1429.  Once the application has been filed, an [USCIS] officer interviews the applicant and makes a determination to either approve or deny the application. 8 U.S.C. § 1446.  If the application is denied, the applicant can request a hearing before an immigration officer. 8 U.S.C. § 1447(a).  This second hearing must be before an officer of a higher grade level than the first. 8 C.F.R. § 336.2(b).  If the [USCIS] again denies the application, . . ., the applicant may seek review of the denial in the United States District Court. 8 U.S.C. § 1421(c).  Applicants may only appeal to the district court, however, if they either sought administrative review and the application was again denied, or if they sought administrative review and the review was delayed for more than 120 days.  *Id.* at § 1421(d).

*Aparicio v. Blakeway*, 302 F.3d 437, 440 (5th Cir. 2002).

Section 1421(c) provides that the district court's review "shall be *de novo*, and the court shall make its own findings of fact and conclusions of law and shall, at the request of the petitioner, conduct a hearing *de novo* on the application."  8 U.S.C. § 1421(c). "This grant of authority is unusual in its scope – rarely does a district court review an agency decision de novo and make its own findings of fact."  *Nagahi v. INS*, 219 F.3d 1166, 1169 (10th Cir. 2000).  Accordingly, unlike the typical administrative review of an agency decision, the Court's review of the denial of a naturalization application is not deferential. *See United States v. Hovsepian*, 359 F.3d 1144, 1162 (9th Cir. 2004) (*en banc*) (observing that "the district court has the final word and does not defer to any of the INS's findings or conclusions"); *Mobin v. Taylor*, 598 F.Supp.2d 777, 781 (E.D.Va. 2009) (observing that the district court's *de novo* review is "without

*Chevron* deference afforded to the administrative findings of either the BIA or the BCIS."). Moreover, this Court's review "is not limited to any administrative record," and its decision "may be on facts established in and found by the district court *de novo*." *Aparicio*, 302 at 445.

Omar asserts that *de novo* review necessarily requires a hearing on the matter and excludes summary judgment. However, *de novo* review and summary judgment are not mutually exclusive. If there is no genuine issue of material fact, a court may properly to enter summary judgment. *See Chan,* 464 F.3d at 296 ("On [plaintiff's] interpretation of section 1421(c), moreover, district courts are required to hold bench trials even when there are no disputed issues of material fact. We think that result absurd."). As explained below, in the instant case, no genuine issue of material fact exists and, thus, Defendants' request for summary judgment should be granted. Thus, it is also recommended that Omar's request for a hearing *de novo* (Doc. No. 38) be DENIED.

### III. SUMMARY JUDGMENT

**A. Standard**

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party can meet this burden in two ways: by presenting sufficient evidence to indicate there is no genuine issue of material fact; or by arguing the non-moving party, after adequate time for discovery, has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986). The moving party may rely on depositions, answers to interrogatories, and the like, to demonstrate that the non-moving party has no evidence to prove his case and hence that there can be no factual dispute. *Id.* at 328 (White, J., concurring). However, "it is not enough to move for summary judgment . . . with a conclusory assertion that the [non-moving party] has no evidence to prove his case." *Id.*

Once the moving party has met its burden, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but must set forth through competent and material evidence specific facts showing that there is a genuine issue for trial. *See Cox v. Kentucky Department of Transportation*, 53 F.3d 146, 149 (6th Cir. 1995). That is, the nonmoving party has an affirmative duty to direct the court's attention to specific evidence upon which it seeks to rely. *Al-Qudhai'een v. America West Airlines, Inc.*, 267 F. Supp.2d 841, 845 (S.D. Ohio 2003) *citing In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

In assessing the merits of the motion, a Court should "draw all reasonable inferences in favor of the nonmoving party." *Joostberns v. United Parcel Servs., Inc.*, 2006 U.S. App. LEXIS 533 at *8 (6th Cir. 2006). In addition, the Court "does not weigh the evidence or make credibility determinations." *Id.*; *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). In other words, the court should determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251 (1986).

**B. Analysis**

Defendants assert that no genuine issue of material fact exists that Omar has

failed to meet his burden that he is eligible for naturalization. Specifically, Defendants assert that Omar cannot demonstrate that he has "good moral character" required for naturalization.

A lawful permanent resident may become a citizen by filing Form N-400, Application. Pursuant to 8 U.S.C. § 1427(a), an applicant for citizenship by naturalization must:

> (1) immediately preceding the date of filing his application for naturalization *has resided continuously*, after being lawfully admitted for permanent residence, within the United States *for at least five years* and during the five years immediately preceding the date of filing his application has been physically present therein for periods totaling at least half of that time, and who has resided within the State or within the district of the Service in the United States in which the applicant filed the application for at least three months, (2) has resided continuously within the United States from the date of the application up to the time of admission to citizenship, and (3) *during all the periods referred to in this subsection has been and still is a person of good moral character*, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States.

(emphasis added.)

However, a lawful permanent resident may be eligible for naturalization after only three years of residency if during the three years immediately preceding the date of filing his application he has been living in martial union with a citizen spouse. 8 U.S.C. § 1430.

In the instant action, Omar originally filed an application for naturalization on the basis that he had been a lawful permanent resident for three years and was married to a United States citizen. Approximately three years later, Omar filed a second application for naturalization on the basis that he had been a lawful permanent resident for five years. The USCIS denied both applications on the basis that Omar failed to

9

establish good moral character. The USCIS denied the original petition for an additional reason, namely, Omar had failed to establish that he lived in martial union for the statutorily required period.

This appeal focuses on Omar's alleged lack of good moral character, as a lack of good moral character is a bar to naturalization no matter what basis a person seeks naturalization. "Good moral character" is a condition precedent for naturalization. 8 U.S.C. § 1427(a)(3) and (e). Section 1427(a)(3) provides that "no person . . . shall be naturalized unless such applicant . . . during [the five years immediately preceding the date of filing his petition] has been and still is a person of good moral character." The petitioner has the burden to establish by a preponderance of the evidence that he meets all of the requirements of naturalization and any doubts are to be resolved in favor of the United States. *Berenyi v. District Director, INS*, 385 U.S. 630, 637 (1967).

While the Immigration and Nationality Act ("INA") does not define good moral character, it does provide a non-exhaustive list of instances in which a person should not be regarded as having good moral character. 8 U.S.C. § 1101(f). Courts analyze good moral character on a case-by-case basis using "the standard of the average citizen in the community" as a guide. 8 C.F.R. § 316.10(b).

The INA does, however, provide guidance in a few special situations. Here, the pertinent section provides that:

> [n]o person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was . . . one who has given false testimony for the purpose of obtaining any benefits under this chapter.

8 U.S.C. § 1101(f)(6). In this inquiry, the subject matter of the false testimony is

10

irrelevant, and it does not matter whether the false testimony was given to hide a fact that would actually disqualify an applicant from naturalization. 8 C.F.R. § 316.10(b)(2)(vi). Furthermore, false testimony is not rendered inconsequential due to its seemingly innocuous nature. Rather, any testimony given under oath that is false can be used to show that the petitioner lacked good moral character, no matter how trivial or inconsequential. *See Kungys v. United States*, 485 U.S. 759, 780 (1988). The question the court must determine is whether the false testimony was given with the subjective intent to obtain an immigration benefit. *Id.* at 779-80. Accordingly, neither accidental falsehoods nor willful misrepresentations for reasons other than obtaining immigration benefits are sufficient to foreclose a finding of good moral character. *See id.* Thus, it is the subjective intent to deceive the federal government in an attempt to obtain an immigration benefit that reflects poorly upon an applicant's good moral character. *Id.*

Defendants assert that Omar has not satisfied his burden that he is a person of good moral character. Specifically, Defendants maintain that Omar's lack of good moral character is shown by the fact that he gave false testimony before an INS adjudication officer on July 5, 2001, during his interview on his first application for naturalization filed on September 21, 1998.

During this interview, Omar testified that he and his wife, Flanagan, were "occupying" his residence at 3635 West 140th Street, Cleveland, Ohio. (Doc. No. 28, Ex. L at 3.) Omar testified that sometimes he and Flanagan slept together and that sometimes that they slept separately. (*Id*. at 3-4.) He testified that the night before the interview that they slept in separate bedrooms but in the same residence. (*Id*. at 4.)

11

Omar also testified that his stepson, Joey, was living in the same residence and slept in the same bedroom as him the night before the interview. (*Id*. at 5-6, 8, 10.)

However, during a June 29, 2006 interview on the appeal of the denial of the two naturalization applications, Omar admitted that he had not been living with Flanagan at the time of the July 5, 2001 interview and, in fact, for the two years prior to the July 5, 2001 interview, *i.e.*, since 1999. (Doc. No. 28, Ex. O at 13-14.) Moreover, in an affidavit, Flanagan stated that she moved out of the residence she shared with Omar in 1995 and never lived with him again, aside from a period of less than a month in February 1996. (Doc. No. 28, Ex. P, Flanagan Aff. at 3.) She also stated that she never lived at 3635 West 140th, Cleveland, Ohio residence at all. (*Id*. at 8.)

Omar claims that his testimony was "honest, straightforward, and consistent." (Doc. No. 44 at 17.) Omar takes issue with the fact that the Immigration Adjudications officer employed the word "occupying" when he asked Omar on July 5, 2001, "Who is occupying the bedrooms now?" and Omar answered, "Me and my wife." (Doc. No. 44 at 17; *see also* Doc. No. 28 , Ex. L at 3.) Omar asserts that he did not hold himself out as "living with" Flanagan on July 5, 2001. However, the definition of "occupy" is "To reside in as an owner or a tenant." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1998). Omar offers no alternate definition or meaning for the word "occupying." Taken on its face, Omar's answer that he and his wife were residing in the bedrooms as an owner or tenant sounds very much like he was holding himself out as living with Flanagan at the time of the interview.

Omar next argues that he had no reason to hold himself out as living with Flanagan on July 5, 2001 because he was not required to be living with her or in martial

12

union on that date to show eligibility for naturalization under the law. However, it does not matter whether the false testimony was given to hide a fact that would actually disqualify Omar from naturalization. 8 C.F.R. § 316.10(b)(2)(vi). Rather, the question before the court is whether Omar had the subjective intent to deceive the federal government in an attempt to obtain an immigration benefit. *See Kungys*, 485 U.S. 779-80. It appears that Omar did, in fact, possess this subjective intent.

Omar's false testimony stems from questions regarding whether or not he was living with his citizen wife. The legitimacy of his marriage to her was a central concern to the determination of eligibility. The evidence shows that he not only lied about his living arrangements, but that he sought to intentionally deceive the government regarding Flanagan's residence. In her affidavit, Flanagan stated that even though she never lived at the 3635 West 140th, Cleveland, Ohio residence, Omar told her to get an ID with that address on it and he took her to get the ID. (Doc. No. 28, Ex. P, Flanagan Aff. at p.8.) Moreover, Omar offers no alternative explanation for the deception.

Omar attempts to raise questions about the process under which the USCIS determined that he lacked good moral character and denied his applications. Omar asserts that the USCIS was not forthcoming in the evidence it used to make its determination. Specifically, Omar points to the fact that in the denial of his first application for naturalization, the USCIS stated that Omar gave "false testimony on July 5, 2001 when you swore under oath that you and your wife were living together in a martial union as required by statute. This finding is supported by the evidence of your recorded testimony, your wife's recorded testimony, and other evidence in the record." (Doc. No. 28, Ex. J at 5-6.) Omar asserts that Defendants have not produced or

13

identified what the "other evidence" is that supports their decision.

Omar also questions the basis on which the USCIS originally denied his naturalization applications. Omar points to the fact that the USCIS denied his naturalization applications on February 22, 2006 for the reason that he had given false testimony at his July 5, 2001 hearing. However, the interview during which Omar admitted that he was not living with Flanagan for the two years prior to the 2001 interview did not occur until after that decision in June 2006. Similarly, Flanagan's affidavit in which she states that she did not live with Omar since 1995 is dated June 2006.

While these issues certainly do not cast the USCIS in the best possible light and raise questions regarding the basis upon which the USCIS made its original determination, they are irrelevant to the determination before this court. The court's role is not review the administrative process of the USCIS, but rather to make a *de novo* decision as to whether Omar is eligible for naturalization. This court is "is not limited to any administrative record," and may base its decision on "facts established in and found by the district court *de novo*." *Aparicio*, 302 at 445.

Because Omar is unable to demonstrate that false testimony regarding Flanagan's residence at the time of the July 2001 interview was not given to obtain immigration benefits, Omar is unable to meet his burden of establishing the good moral character required to qualify for naturalization. Thus, it is recommended that the motion for summary judgment be granted in favor of Defendants.

14

### IV. CONCLUSION

For the foregoing reasons, it is recommended that Plaintiff's motion for a *de novo* hearing (Doc. No. 38) be DENIED and Defendants' motion for summary judgment (Doc. No. 28) be GRANTED.


Date: June 22, 2010 
s/ *Nancy A. Vecchiarelli*
Nancy A. Vecchiarelli
United States Magistrate Judge

### OBJECTIONS
**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of this notice. Failure to file objections within the specified time may waive the right to appeal the District Court's order.** ***See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**